# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| CUNNINGHAM BROTHERS AUTO PARTS, LLC, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>TAKATA CORPORATION, TK HOLDINGS, INC., HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., BAYERISCHE MOTOREN WERKE AG, BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC, FORD MOTOR COMPANY, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., AND TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., MAZDA MOTOR CORPORATION, MAZDA MOTOR OF AMERICA, INC., NISSAN MOTOR CO., LTD., NISSAN NORTH AMERICA, INC., FUJI HEAVY INDUSTRIES, LTD., SUBARU OF AMERICA, INC.,<br><br>        Defendants. | W.D. Va. Case No. _____<br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

NATURE OF CLAIMS ................................................................................................. 1

JURISDICTION AND VENUE ................................................................................. 11

THE PARTIES ........................................................................................................... 12

    I.    Takata Defendants ......................................................................... 12

    II.   Vehicle Manufacturer Defendants ............................................... 13

    III.  Plaintiff and the Class ................................................................... 17

GENERAL ALLEGATIONS ..................................................................................... 18

    I.    Takata Is a Major Manufacturer of Airbags and Inflators ........... 26

    II.   Takata's Airbags Have a Common, Uniform Defect .................... 27

          A.  Takata Recklessly Chose an Inexpensive and Dangerous Propellant ........... 27

          B.  Takata's Knowledge of the Inflator Defect ............... 31

    III.  Takata Airbag Failures and Defendants' Inadequate Reaction ........... 33

          A.  2003-2008: Early Incidents and the 2008 Honda Recall (08V-593) ........... 33

          B.  2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA ........... 37

          C.  2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations ........... 42

          D.  2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260) ........... 43

          E.  2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132) ........... 46

          F.  2014-2015: Forced National Recall and Takata's Admission of a Defect ........... 51

    IV.  The Vehicle Manufacture Defendants Sold Their Vehicles as "Safe" and "Reliable" ........... 57

    V.   Automotive Recyclers Purchased Vehicles Containing Defective Airbags for Amounts Greater Than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale ........... 64

TOLLING OF THE STATUTE OF LIMITATIONS .................................................................... 65

CLASS ACTION ALLEGATIONS ........................................................................................... 67

REALLEGATION AND INCORPORATION BY REFERENCE ............................................... 73

CLAIMS FOR RELIEF ............................................................................................................. 73

    Count I: Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and
    Corrupt Organizations Act ("RICO"), Against the Takata Defendants .......................... 73

    Count II: Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and
    Corrupt Organizations Act ("RICO"), Against the Takata Defendants and the
    Honda Defendants ........................................................................................................... 85

    Count III: Violation of the Lanham (Trademark) Act, 15 U.S.C. §§ 1501 *et seq.* ........ 90

    Count IV: Fraudulent Concealment ................................................................................ 99

PRAYER FOR RELIEF ........................................................................................................... 102

DEMAND FOR JURY TRIAL ................................................................................................. 103

Plaintiff, based on personal knowledge as to itself, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF CLAIMS

1.      People and businesses trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended. Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Defendant Takata Corporation and its related entities ("Takata"), and equipped in vehicles manufactured by Honda, BMW, Ford, Mazda, Nissan, Subaru, and Toyota, and their related entities (collectively the "Vehicle Manufacturer Defendants"), and in vehicles manufactured by Chrysler and General Motors. Chrysler, General Motors.[1]

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect"). The inflator, as its name suggests, is

---

[1] GM and Chrysler, prior to their bankruptcies, also manufactured vehicles with defective Takata airbags. Although claims are not being asserted against Chrysler and GM based on vehicles manufactured and sold prior to their bankruptcies, claims are being asserted against the Takata Defendants based on those vehicles.

- 1 -

supposed to inflate the airbag upon vehicle impact. In the milliseconds following a crash, the

inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the

airbag cushion to expand and deploy.

5.     The following basic illustration depicts Takata's airbag module:



6.     In the late 1990s, Takata shelved a safer chemical propellant in favor of

ammonium nitrate, a far cheaper and more unstable compound that is much better suited for

large demolitions in mining and construction.

7.     Under ordinary conditions, including daily temperature swings and contact with

moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing

irregular and dangerous behavior ranging from inertness to violent combustion. When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata appears to be the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8. As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants. As of January 2015, complaints to regulators blame Takata airbags for at least seven deaths and 139 injuries, including at least 37 reports of airbags that ruptured or spewed metal or chemicals.

9. When the Vehicle Manufacturer Defendants purchased Takata's airbags for their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

10. The volatility and instability of Takata's ammonium nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

11. Takata and the Vehicle Manufacturer Defendants first received word of startling airbag failures no later than 2003, when a Takata inflator ruptured in a BMW vehicle in Switzerland. BMW and Takata jointly investigated the incident in one of Takata's Michigan facilities, and inaccurately minimized the incident as an anomaly, without alerting federal safety regulators.

12.     Similarly, in 2004, a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata investigated the incident and inaccurately minimized it as "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

13.     The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by prior Takata airbag ruptures or explosions.  It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

14.     Behind the scenes, however, Takata and Honda were busy conducting tests that revealed far more serious problems.  As reported in *The New York Times*, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect.  After a 2007 airbag rupture, Honda began collecting inflators for further testing as well.

15.     Tragically, these airbag failures were the first of many to come. Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls.  Despite the repeated Takata/Honda recalls, and though the other Vehicle Manufacturer Defendants knew their vehicles were also equipped with Takata airbags containing ammonium nitrate, they failed to take reasonable measures to investigate.

16.     Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators, the press, and private plaintiffs.  By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action.  Whereas approximately 3 million vehicles had been recalled up until that point (the vast majority of which were Hondas), the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers.  Just one year later, in June 2014, another 5.6 million vehicles were recalled.  By October 2014, global recalls reached an approximated 16.5 million vehicles.

17.     Even then, Defendants worked hard to limit the scope of the recall to humid parts of the country.  They strenuously and falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South.  And they mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.

18.     By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures*.

19.     With additional pressure and public scrutiny, the Vehicle Manufacturer Defendants eventually agreed to NHTSA's demand.  At that point, reports of the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide.

20. In response to the additional pressure and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to rupture.

21. In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate. Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate. And shockingly, Takata still intends to produce new inflators with ammonium nitrate, even after conceding that such inflators create an unacceptable public safety hazard.

22. Further, in its DIRs, Takata acknowledged that the defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

23. As a result of Takata's admission that its inflators are defective, NHTSA now estimates that there are 23.4 million defective inflators in over 19 million vehicles in the United

States.  While Takata has records of which manufacturers it sold defective inflators to, it claims not to have records of which vehicles those inflators were installed in.  The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs.

24.     Still, Takata refuses to immediately conduct nationwide recalls of all airbags containing the Inflator Defect.  Instead, it is still insisting on regional, phased recalls of vehicles equipped with its PSPI-L passenger air bag inflators, PSPI passenger air bag inflators.

25.     As a result of Defendants' concealment of the Inflator Defect for more than a decade, the recalls now underway cannot be implemented effectively.  Defendants have acknowledged that the process could take at least three *years* because of supply constraints. Even before Takata announced that its inflators were defective and the number of recalled vehicles increased, Honda's spokesman acknowledged that "[t]here's simply not enough parts to repair every recalled single car immediately."

26.     Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced.  Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced.  And following Takata's submission of the May 18th DIRs, NHTSA's recall website received over one million visits.

27.     Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars.  Most of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiff and Class members.

For example, Toyota has simply disabled the dangerous passenger-side airbags in vehicles, and has offered stickers to paste onto the dashboard as a reminder not to sit in that seat. Likewise, General Motors has recommended owners prohibit anyone from riding in the passenger seat. As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

28.    Worse yet, certain recalls for passenger-side airbags remain regional in scope. This is an indefensible and unnecessarily risky approach because: (a) Defendants have claimed they have yet to uncover the root cause of the Inflator Defect, making their geographic boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and dangerous ammonium nitrate propellant that is prone to overly-aggressive combustion and becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

29.    Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant within the inflator, a fact that Takata's representative admitted at a recent Congressional hearing. At the Congressional hearing, the Takata representative repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

30.    Takata and the Vehicle Manufacturer Defendants knew or should have known that the Takata airbags installed in millions of vehicles were defective. Both Takata and the Vehicle Manufacturer Defendants, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have

- 8 -

shown a blatant disregard for public welfare and safety. Moreover, the Vehicle Manufacturer Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

31. The actions of Defendants Takata and Honda have been especially disturbing. Despite the shocking record of injuries and failures in Honda vehicles, Takata and Honda were slow to report the full extent of the danger to drivers and passengers, and they failed to issue appropriate recalls. Honda and Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem. Although Takata and Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 13 years.

32. Even before purchasing inflators from Takata, the Vehicle Manufacturer Defendants were aware that Takata used volatile and unstable ammonium nitrate as the primary propellant in its inflators, and thus the Vehicle Manufacturer Defendants were on notice of the Inflator Defect even before they installed the inflators in their vehicles, because Takata reviewed the designs of the inflators with the Vehicle Manufacturers and the Vehicle Manufacturers approved the designs. The Vehicle Manufacturer Defendants were also put on notice of the Inflator Defect not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Because their vehicles also contained Takata airbags, the Vehicle Manufacturer Defendants knew or should have known at that time that there was a safety problem with their

- 9 -

airbags, and the Vehicle Manufacturer Defendants should have launched their own investigations and notified their customers. That responsibility only grew as incidents multiplied.

33.     Instead, Defendants put profits ahead of safety. Takata cut corners to build cheaper airbags, and the Vehicle Manufacturer Defendants sold vehicles that they knew or should have known contained those defective airbags. For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only very recently – on the heels of media scrutiny – have Defendants begun recalling the millions of vehicles in the United States with the Inflator Defect.

34.     As a result of Defendants' misconduct, Plaintiff and members of the proposed Class were harmed and suffered actual damages. The defective Takata airbags are worthless and they also significantly diminish the value of the vehicles in which they are installed.

35.     Further, Plaintiff and the Class did not receive the benefit of their bargain; rather, they purchased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer and business expectations regarding safe and reliable operation. Purchasers of the Class Vehicles paid more than they would have had the Inflator Defect been disclosed.

36.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

37.     Automotive recyclers like Plaintiff and members of the Class purchased Class Vehicles and the defective Takata airbags contained in the vehicles, but are now unable to sell the airbags, which are essentially valueless. Had they known the truth about the problems associated with the Inflator Defect, the automotive recyclers would not have purchased the Class Vehicles and airbags contained therein or would have paid a reduced amount. Moreover,

- 10 -

automotive recyclers have suffered economic injury as they incurred additional costs for storing, maintaining, or otherwise disposing of the defective Takata airbags.

38.     The damage suffered by the automotive recyclers extends far beyond the defective airbags they purchased which are now essentially worthless.  Plaintiff and members of the Class paid more for the vehicles (and parts contained therein) with defective airbags than they would have had they known of the defect.  The Class Vehicles (and their constituent parts) have diminished in value as a direct result of Defendants' conduct, further injuring Plaintiff and members of the Class.  These damages will likely continue as the magnitude of the recalls is absorbed into the industry.

## JURISDICTION AND VENUE

39.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiff's Lanham Act and RICO claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

40.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants, pursuant to Code of Virginia § 8.01-328.1, because Plaintiff's claim arise from Defendants' conducting substantial business in Virginia; contracting to supply services or things in Virginia; causing tortious injury by an act or omission in Virginia; and causing tortious injury in Virginia by an act or omission outside because they regularly do or solicit business, engage in other persistent courses of conduct, or derive substantial revenue from goods used or consumed in Virginia.

- 11 -

41.     This Court also has personal jurisdiction over the Takata Defendants and the Honda Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district.  Also, venue is proper in this District pursuant to 18 U.S.C. § 1965.

<u>**THE PARTIES**</u>

**I.     <u>Takata Defendants</u>**

43.     Defendant Takata Corporation ("Takata") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Takata is a specialized supplier of automotive safety systems that designs, manufactures, tests, markets, distributes, and sells airbags.  Takata is a vertically-integrated company and manufactures component parts in its own facilities.  Takata, either directly or through its wholly-owned subsidiaries, manufactures airbags for distribution in the United States and Florida, including the airbags at issue in this litigation.  Takata delivers its products, including the airbags at issue in this litigation, into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

44.     Defendant TK Holdings Inc. ("TK Holdings") is a subsidiary of Takata Corporation and is headquartered in Auburn Hills, Michigan.  TK Holdings sells, designs, manufactures, tests, markets, and distributes airbags in the United States.  TK Holdings both directly and through subsidiaries, owns and operates 56 manufacturing plants in twenty

countries. TK Holdings manufactures airbags in the United States, including airbags at issue in this litigation. TK Holdings delivers its products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

45.     Defendants Takata and TK Holdings are collectively referred to as "Takata" or the "Takata Defendants." Takata is the manufacturer of all the defective airbags that are the subject of this Complaint.

## II.     <u>Vehicle Manufacturer Defendants</u>

46.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

47.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California. American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

48.     Defendants Honda Motor and American Honda are collectively referred to as "Honda" or "Honda Defendants." Honda vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants. The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

- 13 -

49. Defendant Bayerische Motoren Werke AG ("BMW AG") is a German holding company and automobile manufacturer. BMW AG is headquartered in Munich, Bavaria, Germany. BMW Group is a subsidiary of BMW AG and is also headquartered in Munich. BMW AG, together with its subsidiaries, develops, manufactures, and sells cars and motorcycles worldwide.

50. Defendant BMW of North America, LLC ("BMW North America") is a subsidiary of BMW AG and is headquartered in Woodcliff Lake, New Jersey. BMW of North America is the United States importer of BMW vehicles.

51. Defendant BMW Manufacturing Co., LLC ("BMW Manufacturing") is a subsidiary of BMW AG and is headquartered in Greer, South Carolina. BMW Manufacturing is the United States manufacturer of BMW vehicles.

52. Defendants BMW AG, BMW North America, and BMW Manufacturing are collectively referred to as "BMW" or "BMW Defendants." BMW vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants. The BMW Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

53. Defendant Ford Motor Company ("Ford") is headquartered in Dearborn, Michigan. Ford develops, manufactures, distributes, and services vehicles, parts, and accessories worldwide, including in the United States. Ford vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants.

54. Defendant Mazda Motor Corporation ("Mazda"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Mazda's global headquarters are located in Hiroshima, Japan.

- 14 -

55.     Defendant Mazda Motor of America, Inc. doing business as Mazda North American Operations ("Mazda North American"), a subsidiary of Mazda, is a California corporation with its corporate headquarters located in Irvine, California. Mazda North American is responsible for the distribution, marketing and sales of Mazda brand automobiles in the United States.

56.     Defendants Mazda and Mazda North American are collectively referred to as "Mazda" or the "Mazda Defendants." Mazda vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants. The Mazda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Virginia.

57.     Defendant Nissan Motor Company, Ltd. ("Nissan"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide. Nissan's global headquarters are located in Yokohama, Japan.

58.     Defendant Nissan North America, Inc. ("Nissan North America"), a subsidiary of Nissan, is a California corporation with its corporate headquarters located in Franklin, Tennessee. Nissan North America is responsible for the distribution, marketing and sales of Nissan and Infiniti brand automobiles in the United States.

59.     Defendants Nissan and Nissan North America are collectively referred to as "Nissan" or the "Nissan Defendants." Nissan vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants. The Nissan Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

60.     Defendant Fuji Heavy Industries, Ltd. ("Fuji"), the parent company of Subaru, is a transportation conglomerate.  Along with its subsidiaries, Fuji develops, manufactures, and sells automotive vehicles worldwide.  Fuji's global headquarters are located in Tokyo, Japan.

61.     Defendant Subaru ("Subaru"), a subsidiary of Fuji, develops, manufactures, and sells automotive vehicles worldwide.  Subaru's global headquarters are located in Tokyo, Japan.

62.     Defendant Subaru of America, Inc. ("Subaru America"), a subsidiary of Fuji, is a New Jersey corporation with its corporate headquarters located in Cherry Hill, New Jersey.  Subaru of America is responsible for the distribution, marketing and sales of Subaru brand automobiles in the United States.

63.     Defendants Fuji, Subaru and Subaru America are collectively referred to as "Subaru" or the "Subaru Defendants."  Subaru vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants.  The Subaru Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

64.     Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

65.     Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation.  Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota Motor Corporation.

- 16 -

66.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan.  TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada.  TEMA is a subsidiary of Toyota Motor Corporation.

67.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants."  Toyota vehicles sold in the United States contain defective airbags manufactured by the Takata Defendants.  The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers and businesses in the United States and the State of Virginia.

68.     All of the non-Takata Defendants are collectively referred to as the "Vehicle Manufacturer Defendants."

## III.    Plaintiff and the Class

### Plaintiff

69.     Cunningham Brothers Auto Parts, LLC ("Cunningham") is an automotive parts recycler and Delaware limited liability company with its principal place of business at 10980 Wards Rd., Rustburg, VA 24588.  Cunningham purchased Class Vehicles, as defined below, which contained Takata airbags, prior to the recalls set forth herein, and Cunningham still possesses and maintains Takata airbags that were contained in the Class Vehicles as well as other parts for Class Vehicles.  Had Cunningham known of the Inflator Defect, it would not have paid as much for the Class Vehicles as it did.

### The Automotive Recycler Class

70.     Cunningham brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Class:

> **All automotive recyclers in the United States who, prior to the date on which a Class Vehicle was recalled, purchased a Class Vehicle containing an undeployed Takata airbag, and who: (i) still possess any such airbag; or (ii) sold any such airbag or component of the airbag module to Takata and/or the Vehicle Manufacturer Defendants or an agent or third party acting on their behalf, after the date on which the Class Vehicle was recalled (the "Nationwide Automotive Recycler Class")**

71.     Automotive recyclers include full service and self-service automotive recyclers, which remove automotive parts from motor vehicles for disposal or resale to and reuse by consumers.

72.     The Nationwide Automotive Recycler Class and their members are sometimes referred to herein as the "Class."

73.     Excluded from the Class are Takata and the Vehicle Manufacturer Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly

- 18 -

owned subsidiaries or affiliates of Takata and the Vehicle Manufacturer Defendants; Class

Counsel and their employees; and the judicial officers and their immediate family members and

associated court staff assigned to this case.

## GENERAL FACTUAL ALLEGATIONS

74.     Plaintiff brings this action on behalf of itself and all persons similarly situated

who purchased Class Vehicles (defined below).  Plaintiff seeks redress individually and on

behalf of those similarly situated for economic losses stemming from Defendants' manufacture

or use of Defective Airbags in the Class Vehicles, including but not limited to diminished value

of the Defective Airbags and the Class Vehicles and their constituent parts.  Plaintiff, on behalf

of itself and those similarly situated, seek to recover damages and statutory penalties, and

injunctive relief/equitable relief.

75.     "Defective Airbags" refers to all airbags (including inflators) manufactured by

Takata ("Takata airbags") that are subject to the recalls identified in the table set forth in

paragraph 76, *infra*, all Takata airbags subject to recalls relating to Takata's May 18, 2015 DIRs,

and all Takata airbags subject to any subsequent expansion of pre-existing recalls, new recalls,

amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting

class certification, relating to the tendency of such airbags to over-aggressively deploy, rupture,

or fail to deploy.  All Defective Airbags contain the Inflator Defect.  As a result of the Inflator

Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel

metal shrapnel that tears through the airbag and poses a threat of serious injury or death to

occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the

airbag; and (c) fail to deploy altogether.

76.     "Class Vehicles" refers to all vehicles purchased in the United States that have Defective Airbags.

77.     As detailed in this Complaint, over the course of seven years Takata and the Vehicle Manufacturer Defendants have issued a series of partial, misleading, and ultimately ineffective recalls to address the Defective Airbags.  For reference, the following table identifies the recalled vehicles by manufacturer, and which of the front airbags were included in the recall for each vehicle (driver or passenger):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 13V172 | BMW | 325Ci | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325iT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xi | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xiT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Coupe | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330xi Sedan | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Coupe | 2002-2003 | Passenger |
| BMW | 14V348 | BMW | 325i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 325xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | 330i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 330xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | M3 | 2004-2006 | Both |
| BMW | 14V428 | BMW | 323i | 2000 | Passenger |
| BMW | 14V428 | BMW | 325i | 2001-2006 | Passenger |
| BMW | 14V428 | BMW | 325xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | 328i | 2000 | Passenger |
| BMW | 14V428 | BMW | 330i | 2001-2006 | Passenger |
| BMW | 14V428 | BMW | 330xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | M3 | 2001-2006 | Passenger |
| BMW | 15V318 | BMW | 325i/325xi/330i/330xi Sedan | 2002-2005 | Driver |
| BMW | 15V318 | BMW | 325xi/325i Sports Wagon | 2002-2005 | Driver |

- 20 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 15V318 | BMW | 330Ci/325Ci/M3 Convertible | 2002-2006 | Driver |
| BMW | 15V318 | BMW | 325i/330i/M3 Coupe | 2002-2006 | Driver |
| BMW | 15V318 | BMW | M5/540i/525i/530i Sedan | 2002-2006 | Driver |
| BMW | 15V318 | BMW | 540i/525i Sports Wagon | 2002-2003 | Driver |
| BMW | 15V318 | BMW | X5 3.0i/4.4i Sports Activity Vehicle | 2003-2004 | Driver |
| Chrysler | 14V354 | Chrysler | 300 | 2005-2008 | Both |
| Chrysler | 14V354 | Chrysler | Aspen | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Dakota | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Durango | 2004-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 1500 | 2003-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 2500 | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 Cab Chassis | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 4500 Cab Chassis | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 5500 | 2008 | Both |
| Chrysler | 14V770 | Chrysler | 300 | 2005 | Passenger |
| Chrysler | 14V770 | Chrysler | SRT8 | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Dakota | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Durango | 2004-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Magnum | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 1500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 2500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 3500 | 2003-2005 | Passenger |
| Chrysler | 14V817 | Chrysler | 300 | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | 300C | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | Aspen | 2007 | Driver |
| Chrysler | 14V817 | Chrysler | SRT8 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Charger | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Dakota | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Durango | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Magnum | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 1500 | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 2500 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 3500 | 2006-2007 | Driver |

- 21 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Chrysler | 14V817 | Mitsubishi | Raider | 2006-2007 | Driver |
| Chrysler | 15V312 | Dodge | Ram 1500/2500/3500 | 2003 | Passenger |
| Chrysler | 15V313 | Dodge | Ram 2500 Pickup | 2005-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 1500 Pickup | 2004-2008 | Driver |
| Chrysler | 15V313 | Dodge | Ram 3500 Pickup | 2006-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 3500 Cab Chassis | 2007-2009 | Driver |
| Chrysler | 15V313 | Dodge | Ram 4500/5500 Cam Chassis | 2008-2010 | Driver |
| Chrysler | 15V313 | Sterling | 4500/5500 Cab Chassis | 2008-2009 | Driver |
| Chrysler | 15V313 | Dodge | Durango | 2004-2008 | Driver |
| Chrysler | 15V313 | Chrysler | Aspen | 2007-2008 | Driver |
| Chrysler | 15V313 | Chrysler | 300/300C/SRT8 | 2005-2010 | Driver |
| Chrysler | 15V313 | Dodge | Charger/Magnum | 2005-2010 | Driver |
| Chrysler | 15V313 | Dodge | Dakota | 2005-2011 | Driver |
| Chrysler | 15V313 | Mitsubishi | Raider | 2006-2010 | Driver |
| Chrysler | 15V361 | Sterling | Bullet 4500/5500 Chassis Cab | 2008-2009 | Driver |
| Chrysler | 15V354 | Freightline | Sprinter 2500/3500 | 2007-2008 | Passenger |
| Chrysler | 15V354 | Dodge | Sprinter 2500/3500 | 2006-2008 | Passenger |
| Ford | 14V343 | Ford | GT | 2005-2006 | Both |
| Ford | 14V343 | Ford | Mustangs | 2005-2008 | Driver |
| Ford | 14V343 | Ford | Ranger | 2004-2005 | Both |
| Ford | 14V787 | Ford | GT | 2005-2006 | Passenger |
| Ford | 14V787 | Ford | Ranger | 2004-2005 | Passenger |
| Ford | 14V802 | Ford | GT | 2005-2006 | Driver |
| Ford | 14V802 | Ford | Mustang | 2005-2008 | Driver |
| Ford | 15V322 | Ford | Ranger | 2004-2006 | Passenger |
| Ford | 15V319 | Ford | Mustang | 2005-2014 | Driver |
| Ford | 15V319 | Ford | GT | 2005-2006 | Driver |
| GM | 14V372 | Chevrolet | Cruze | 2013-2014 | Driver |
| GM | 14V471 | Saab | 9-2X | 2005 | Passenger |
| GM/Toyota | 13V133 | Pontiac | Vibe | 2003-2004 | Passenger |
| GM | 15V324 | Chevrolet | Silverado 2500/3500 | 2007-2008 | Passenger |
| GM | 15V324 | GMC | Sierra 2500/3500 | 2007-2008 | Passenger |
| Honda | 08V593 | Honda | Accord | 2001 | Driver |
| Honda | 08V593 | Honda | Civic | 2001 | Driver |
| Honda | 09V259 | Acura | TL/CL | 2002 | Driver |

- 22 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 09V259 | Honda | Accord | 2001-2002 | Driver |
| Honda | 09V259 | Honda | Civic | 2001 | Driver |
| Honda | 10V041 | Acura | CL | 2003 | Driver |
| Honda | 10V041 | Acura | TL | 2002-2003 | Driver |
| Honda | 10V041 | Honda | Accord | 2001-2002 | Driver |
| Honda | 10V041 | Honda | Civic | 2001-2003 | Driver |
| Honda | 10V041 | Honda | CR-V | 2002 | Driver |
| Honda | 10V041 | Honda | Odyssey | 2002 | Driver |
| Honda | 10V041 | Honda | Pilot | 2003 | Driver |
| Honda | 11V260 | Acura | CL | 2003 | Driver |
| Honda | 11V260 | Acura | TL | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Accord | 2001-2002 | Driver |
| Honda | 11V260 | Honda | Civic | 2001-2003 | Driver |
| Honda | 11V260 | Honda | Civic Hybrid | 2003 | Driver |
| Honda | 11V260 | Honda | CR-V | 2002-2004 | Driver |
| Honda | 11V260 | Honda | Odyssey | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Pilot | 2003 | Driver |
| Honda | 13V132 | Honda | Civic | 2001-2003 | Passenger |
| Honda | 13V132 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 13V132 | Honda | Odyssey | 2002 | Passenger |
| Honda | 14V349 | Acura | MDX | 2003 | Passenger |
| Honda | 14V349 | Honda | Accord | 2003 | Passenger |
| Honda | 14V349 | Honda | Civic | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Element | 2003 | Passenger |
| Honda | 14V349 | Honda | Odyssey | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Pilot | 2003 | Passenger |
| Honda | 14V351 | Acura | MDX | 2003-2006 | Driver |
| Honda | 14V351 | Acura | TL/CL | 2002-2003 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2007 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2002 | Driver |
| Honda | 14V351 | Honda | Civic | 2001-2005 | Driver |
| Honda | 14V351 | Honda | CR-V | 2002-2006 | Driver |
| Honda | 14V351 | Honda | Element | 2003-2011 | Driver |
| Honda | 14V351 | Honda | Odyssey | 2002-2004 | Driver |
| Honda | 14V351 | Honda | Pilot | 2003-2007 | Driver |
| Honda | 14V351 | Honda | Ridgeline | 2006 | Driver |
| Honda | 14V353 | Acura | MDX | 2003-2005 | Passenger |

- 23 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 14V353 | Acura | RL | 2005 | Passenger |
| Honda | 14V353 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Civic | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | CR-V | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Odyssey | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | RidgeLine | 2006 | Passenger |
| Honda | 14V700 | Acura | MDX | 2003-2005 | Passenger |
| Honda | 14V700 | Acura | RL | 2005 | Passenger |
| Honda | 14V700 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Civic | 2001-2005 | Passenger |
| Honda | 14V700 | Honda | Civic (CNG) | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Civic Hybrid | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | CR-V | 2002-2005 | Passenger |
| Honda | 14V700 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Odyssey | 2002-2004 | Passenger |
| Honda | 14V700 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Ridgeline | 2006 | Passenger |
| Honda | 15V153 | Honda | Accord | 2001 | Driver |
| Honda | 15V153 | Honda | Civic | 2004 | Driver |
| Honda | 15V153 | Honda | Pilot | 2008 | Driver |
| Honda | 15V320 | Honda | Accord | 2001-2007 | Driver |
| Honda | 15V320 | Honda | Civic | 2001-2005 | Driver |
| Honda | 15V320 | Honda | CR-V | 2002-2006 | Driver |
| Honda | 15V320 | Honda | Element | 2003-2011 | Driver |
| Honda | 15V320 | Honda | Odyssey | 2002-2004 | Driver |
| Honda | 15V320 | Honda | Pilot | 2003-2008 | Driver |
| Honda | 15V320 | Honda | Ridgeline | 2006 | Driver |
| Honda | 15V320 | Acura | CL | 2003 | Driver |
| Honda | 15V320 | Acura | MDX | 2003-2006 | Driver |
| Honda | 15V320 | Acura | TL | 2002-2003 | Driver |
| Mazda | 13V130 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 13V130 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V344 | Mazda | B-Series | 2004 | Both |
| Mazda | 14V344 | Mazda | Mazda6 | 2003-2008 | Both |
| Mazda | 14V344 | Mazda | MazdaSpeed6 | 2006-2007 | Both |
| Mazda | 14V344 | Mazda | MPV | 2004-2005 | Both |

- 24 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Mazda | 14V344 | Mazda | RX-8 | 2004-2008 | Both |
| Mazda | 14V362 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 14V362 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V773 | Mazda | B-Series | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | Mazda6 | 2003-2006 | Passenger |
| Mazda | 14V773 | Mazda | MPV | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | RX-8 | 2004-2005 | Passenger |
| Mazda | 15V345 | Mazda | Mazda 6 | 2003-2008 | Driver |
| Mazda | 15V345 | Mazda | RX-8 | 2004-2008 | Driver |
| Mazda | 15V345 | Mazda | MazdaSpeed 6 | 2006-2007 | Driver |
| Mazda | 15V346 | Mazda | B-Series | 2004-2006 | Passenger |
| Mitsubishi | 14V354 | Mitsubishi | Raider | 2006-2007 | Both |
| Mitsubishi | 14V421 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Mitsubishi | 14V752 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Mitsubishi | 15V321 | Mitsubishi | Lancer/Lancer Evolution | 2004-2006 | Passenger |
| Mitsubishi | 15V321 | Mitsubishi | Lancer Sportback | 2004 | Passenger |
| Nissan | 13V136 | Infiniti | FX35 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | FX45 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | I-30 | 2001 | Passenger |
| Nissan | 13V136 | Infiniti | I35 | 2002-2003 | Passenger |
| Nissan | 13V136 | Infiniti | QX4 | 2002-2003 | Passenger |
| Nissan | 13V136 | Nissan | Maxima | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Pathfinder | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Sentra | 2002-2003 | Passenger |
| Nissan | 14V340 | Infiniti | FX | 2003-2005 | Passenger |
| Nissan | 14V340 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V340 | Infiniti | M | 2006 | Passenger |
| Nissan | 14V340 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V340 | Nissan | Sentra | 2004-2006 | Passenger |
| Nissan | 14V701 | Infiniti | FX35 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | FX45 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V701 | Infiniti | M35 | 2006 | Passenger |
| Nissan | 14V701 | Infiniti | M45 | 2006 | Passenger |
| Nissan | 14V701 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V701 | Nissan | Sentra | 2004-2006 | Passenger |
| Nissan | 15V226 | Nissan | Sentra | 2006 | Passenger |
| Subaru | 14V399 | Subaru | Baja | 2003-2004 | Passenger |

- 25 -

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Subaru | 14V399 | Subaru | Impreza | 2004 | Passenger |
| Subaru | 14V399 | Subaru | Legacy | 2003-2004 | Passenger |
| Subaru | 14V399 | Subaru | Outback | 2003-2004 | Passenger |
| Subaru | 14V471 | Subaru | Baja | 2003-2005 | Passenger |
| Subaru | 14V471 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V471 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V471 | Subaru | Outback | 2003-2005 | Passenger |
| Subaru | 14V763 | Saab | 9-2X | 2005 | Passenger |
| Subaru | 14V763 | Subaru | Baja | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V763 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Outback | 2003-2005 | Passenger |
| Subaru | 15V323 | Subaru | Impreza Sedan/Station Wagon | 2004-2005 | Passenger |
| Subaru | 15V323 | Saab | 9-2x | 2005 | Passenger |
| Toyota | 13V133 | Lexus | SC430 | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V312 | Lexus | SC | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V350 | Lexus | SC430 | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Sequoia | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota | 14V655 | Lexus | SC | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Sequoia | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota/GM | 14V312 | Pontiac | Vibe | 2003-2004 | Passenger |
| Toyota/GM | 14V350 | Pontiac | Vibe | 2003-2005 | Passenger |
| Toyota/GM | 14V655 | Pontiac | Vibe | 2003-2005 | Passenger |

## I. Takata is a Major Manufacturer of Airbags and Inflators

78. Defendant Takata is the world's second largest manufacturer of automotive safety devices, including airbags. Takata was one of the first companies to market driver-side airbags in the early 1980s. Airbags made up 38.2 percent of its business in its most recently reported quarter.

79. Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983. By 2014, Takata had captured 22 percent of the global automotive airbag market.

80. Takata Corporation has claimed to prioritize driver safety as its "dream," "dedication," and "commitment."

81. Takata claims to be "motivated by the preciousness of life" and pledges to "communicate openly and effectively." Takata has failed to live up to these assurances by:

    a. manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;

    b. intentionally concealing the foregoing from Plaintiff, Class members, and federal regulators; and

    c. making incomplete representations about the safety and reliability of its airbags, while purposefully withholding material facts from Plaintiff, Class members, and federal regulators that contradicted these representations.

- 27 -

## II.    Takata's Airbags Have A Common, Uniform Defect

### A.    Takata Recklessly Chose an Inexpensive and Dangerous Propellant

82.    The part of the airbag at issue in this matter is the inflator.  The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

83.    The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



84.     When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

85.     In  the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.  Ammonium nitrate is a dangerous material that should not be used in airbags.  It is an inherently volatile and unstable chemical.

86.     Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility.  It also readily absorbs moisture from the atmosphere.  The chemical's sensitivity to temperature and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert.  As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

87.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and

- 29 -

cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

88.     Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

89.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion.  As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

90.     Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant.  Indeed, Takata's representative confirmed at a recent Congressional hearing that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

91.     The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly.  But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

92.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over

the years. Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

93. For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

94. Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

### B. Takata's Knowledge of the Inflator Defect

95. Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

96. At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this

- 31 -

moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

97.     Mr. Shimizu grossly understated the problem. Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.   Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

98.     On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems. Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

99.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

100.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

101.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant.  In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

102.    Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly."  A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

103.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors.

104.    Moreover, while Defendants, and particularly Takata, had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, GM was recently required to recall model year 2013 and 2014 Chevy Cruze vehicles because of the risk of the Takata airbags rupturing.  And Takata has

- 33 -

now admitted that replacement airbags placed in recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## III.     Takata Airbag Failures and Defendants' Inadequate Reaction

### A.     2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)

105.    Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998.  Since then, Takata airbags containing the Inflator Defect have been installed in vehicles manufactured by at least ten automakers.

106.    On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident.  As summarized in a later section of this Complaint, her car was not recalled until May 2015, more than a decade later.

107.    Also in 2003, an inflator ruptured in a BMW in Switzerland, prompting a January 2004 investigation by Takata and BMW.  That investigation took place at a Takata facility in Michigan, and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective.

108.    In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver.  Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for the incident.  Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge.  Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

- 34 -

109.    Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant.  As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit.  In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

110.    Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

111.    Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture.  The result was so startling that engineers began designing possible fixes in anticipation of a recall.

112.    But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators.  Prototypes of design alternatives were also trashed.  One former Takata employee stated that "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."

113.    Takata did not disclose these tests to the public or federal regulators.  In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008.  Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004,

- 35 -

Plaintiff alleges, upon information and belief, that Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

114.    In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents.  All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags.  As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators.  Rather, it callously risked vehicle occupants' safety as it purportedly awaited a failure mode analysis being conducted by Takata.

115.    After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators.  Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrap yards for the same purpose.

116.    Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion.  Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

117.    The victims of the four Honda incidents – one in 2004 and three in 2007 – brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags

- 36 -

posed a substantial risk of serious injury or death when deployed. In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

> a. On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.
>
> b. On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

118. Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

119. As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and falsely assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

120. Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

- 37 -

**B.** **2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

121.     Additional incidents took place after the 2008 Recall that underscored its inadequacy:

     a.     On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she was bleeding from a severe gash in her neck. Ms. Griffin's car was not part of the 2008 Recall. Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 Recall.

     b.     On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death. Ms. Parham's car was not part of the 2008 Recall.

     c.     Another Takata airbag-related incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

     d.     According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

122.     With incidents mounting, Takata and Honda revisited the issue yet again. In June 2009, Takata reported to Honda that the defective airbag components had been made at its

- 38 -

factory in Moses Lake, Washington. At the time, Takata engineers claimed that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable. The Takata engineers further claimed that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

123.     After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to. At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

124.     In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

125.     As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall"). Thus, it was two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

126.     In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

- 39 -

127. NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

128. NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

129. In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

130. Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

131. Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

132.    Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem.

133.    Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

134.    Takata also claimed that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, it gave just the manufacturing dates.

135.    In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

136.    Takata falsely wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

- 41 -

137.    In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

138.    Based on Takata's and Honda's misrepresentations and omissions concerning the nature and scope of the Inflator Defect, NHTSA closed its investigation into the Takata airbags on May 6, 2010.

139.    In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another purported explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

140.    The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

C.    **2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations**

141.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in

Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

142. In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

143. Honda's explanation for the airbag defect changed yet again, but still misleadingly focused on the manufacturing process. Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

144. Once again, however, injuries continued to mount:

    a. In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only because she applied pressure with her fingers to stem the arterial bleeding.

    b. On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

**D.**     **2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260)**

145. In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

- 43 -

146.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators."  On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

147.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

148.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA.  That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles.  The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled.  Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

149.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect.  According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible."  The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

- 44 -

150.    Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act.  In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014.  Eight of these incidents involved Takata airbags.  In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

151.    Toyota also received additional direct notice of the Inflator Defect in this timeframe.  Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently.  Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate.  In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

152.    Dangerous and tragic incidents continued to mount during this period.

        a.    On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX.  His attorney notified NHTSA on May 26, 2011.

        b.    On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him.  Honda reached a confidential settlement with the driver in 2013.

        c.    On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

- 45 -

d.      On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.      On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.      On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag.  Ms. Blowe brought suit and reached a confidential settlement.

g.      On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

E.      **2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)**

153.      By 2013, it became clear to federal regulators and Defendants were already aware that the Defective Airbag issue, and the number of Defective Airbags, was much more significant than Takata or Honda initially reported to NHTSA.

154.      On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags.  By March 6, 2013, Honda claimed that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

- 46 -

155. In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality. Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

156. On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

157. On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment." In that report, Takata misleadingly attributed the defect to isolated manufacturing flaws, describing the Defective Airbags as follows:

Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

158. It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

- 47 -

159.    In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

160.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.    On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.    On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag.  Ms. Erdman filed suit and reached a confidential settlement.

c.    Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face.  In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building.  As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object.  And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.    On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze

exploded and detached from the steering wheel.  According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

161.    By 2014, the incident rate picked up even more dramatically, with over a dozen incidents involving injury or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California.  For example:

a.      On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b.      On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram 1500 ruptured and ejected metal fragments following an accident.  The driver suffered severe physical injury as a result.

c.      On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d.      On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e.      In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

162.    With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls.  At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."  The referenced incidents included both passenger and driver side

- 49 -

airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

163. On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

164. Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers.

165. On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

166. On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

167. By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million. The Vehicle Manufacturer

- 50 -

Defendants, including the Honda Defendants, however, had still not recalled all of the vehicles containing Defective Airbags.

168.    On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

169.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

170.    The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

        a.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

        b.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

        c.    On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck.  The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea.  Indeed, her death was initially investigated as a homicide by detectives.  A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

- 51 -

## F.  2014-2015: Forced National Recall and Takata's Admission of a Defect

171.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas.  In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

172.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags.  The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk...."  NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

173.    The U.S. Department of Justice is also investigating whether Takata committed any crimes.  On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

174.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient.  NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

175.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall.  Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

176.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures.  As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

177.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags.  Days later, Mazda expanded the geographic scope of its recall.  By December 23, BMW had also agreed to a nationwide recall.

178.    Having misrepresented and omitted the nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved."  A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken

- 53 -

a decade ago. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

179.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

180.    In response to pressure from NHTSA and private plaintiffs and public scrutiny, Defendants were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags. This testing confirmed what Defendants already knew: Takata's airbags containing ammonium nitrate were defective and prone to over-aggressive deployment and rupture.

181.    In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer. On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." And in testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

182.    Still, even Takata's recent defect admission is inaccurate and misleading, because the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate. And

- 54 -

shockingly, Takata still intends to produce new inflators with ammonium nitrate, even after admitting that airbags containing such inflators are prone to rupture, and thus create an unacceptable public safety hazard.

183.    Further, in its DIRs, Takata acknowledged that the Inflator Defect is present in inflators that were installed in vehicles as replacement parts through prior recalls, necessitating a second recall of those vehicles.

184.    As a result of Takata's admission that its inflators are defective, NHTSA now estimates that there are 23.4 million defective inflators in over 19 million vehicles.  While Takata has records tracking which manufacturers it sold Defective Airbags to, it claims not to have records indicating which vehicles those Defective Airbags were installed in.  The Vehicle Manufacturers possess those records, however, and are thus in the process of identifying which vehicles must be recalled based on Takata's DIRs, and its corresponding admission that its inflators are defective.

185.    Still, Takata refuses to immediately conduct nationwide recalls of all airbags containing the Inflator Defect.  While Takata has agreed to participate in a nationwide recall of airbags containing the PSDI, PSDI-4, and PSDI-4K driver-side air bag inflators and SPI passenger-side airbag inflators, it is still insisting on regional, phased recalls of vehicles equipped with its PSPI-L passenger air bag inflators and PSPI passenger air bag inflators.

186.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed in the Section III, *supra*.

        a.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

- 55 -

b. On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

c. On July 28, 2014, Francisco Dearco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

d. On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

e. On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

f. On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

g. On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

h. On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

i. On April 5, 2015, the Takata driver-side airbag in a 2005 Honda Accord ruptured, sending metal shards and shrapnel into the vehicle and severing 22-year old Kylan Langlinais's carotid artery; Honda's recall notice arrived two days after the crash, and Ms. Langlinais died from her injuries two days later.

187.    Over the past 13 years that Takata has known there was a problem with the safety of its airbags, there have been at least seven deaths and 139 injuries linked to defective Takata airbags.  As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota.  Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

188.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use.  A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, an event that may be tied to the unstable and volatile ammonium nitrate propellant.  These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota.  Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).  For example:

a.      Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.      Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

- 57 -

## IV.  The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and "Reliable"

189.    At all relevant times, in advertisements and promotional materials, the Vehicle Manufacturer Defendants continuously maintained that their vehicles were safe and reliable.

190.    Examples of the Vehicle Manufacturers' safety and reliability representations, from 2000 through the present, include the following:

a.    **BMW**:

- In 2005, BMW represented on its website: "Driver's and passenger's front airbag supplemental restraint system (SRS) with "smart" dual-threshold, dual-stage deployment and sensor to help prevent unnecessary passenger's airbag deployment."

- In 2008 BMW represented on its website: "The driver and front passenger airbags provide effective protection for the head and upper-torso area, preventing contact with the steering wheel and dashboard. In a head-on collision, you have the best possible protection."

- In 2008 BMW represented on its website: "The principle behind the function of the front airbags for driver and passenger is very simple: in the event of an impact with a force greater than the safe threshold, the airbag sensors activate a substance that causes the airbags to instantly inflate. Within a fraction of a second, the airbags form a protective cushion over the steering wheel and dashboard, significantly reducing the risk of cranial and upper body injuries."

- 58 -

- In 2015, BMW represented on its website: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

b. **FORD:**

- In 2006, Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."

- In 2006, Ford also represented in brochures that its cars contained a : "Personal Safety System®," which "enhances protection for the driver and front passenger in certain frontal collisions. The system customizes the deployment of the dual-stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."

- In 2015, Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

c. **HONDA:**

- In 2002, Honda represented on its website: "Having already earned top safety ratings with its quadruple five-star front- and side-impact crash test ratings, the 2002 Odyssey now offers the latest generation of airbag systems from Honda. Driver's and front passenger's dual stage airbags (SRS) along with driver's and front passenger's side airbags are now standard equipment on all models - yet another minivan first… Both front airbags have a dual-stage inflator that can deploy the airbag at one of two rates depending on the severity of the crash… The front passenger's side airbag has an automatic cutoff system that is designed to prevent side airbag deployment if a child (or small statured adult) leans into the side airbag deployment path. Once the child returns to an upright position, the side airbag will be able to deploy and provide protection in the event of a side impact… Building on the standard anti-lock braking system (ABS), new standard rear disc brakes result in improved stopping performance with higher resistance to brake fade and a more responsive brake pedal feel. Amber rear turn signals have been added, which help other drivers differentiate the indicators with increased clarity."

- In 2002, Honda represented in a commercial: "5-stars of frontal collision tests… that's a safe car. Safe, get it through your head. To see what safe really means, take a look at a close look at the 2002 civic from Honda."

- In 2002, Honda represented in brochures: "Honda's commitment to safe driving is in evidence throughout every vehicle… Every new vehicle comes with dual front airbags (SRS), most using a dual stage design... All designed to keep you and yours out of harm's way."

- In 2004, Honda represented in brochures: "A glance at the crash-test data posted by the U.S. government's National Highway Traffic Safety Administration reveals a galaxy of 5-star ratings for Honda cars and trucks. In fact, five of our models to date – Accord Coupe, Civic Coupe, CR-V, Odyssey and Pilot – have earned the highest NHTSA crash-test ratings in frontal and side impact testing… It's a solid testament to our emphasis on safety."

- In 2007, Honda represented on its website: "Through innovative original research, Honda has created advanced airbags that offer outstanding levels of occupant protection."

- In 2007, Honda also represented on its website: "Honda led the industry through advances such as driver and front passenger airbags with "dual output inflators" that adjust the deployment force of the airbags to the severity of the crash."

- In 2007, Honda also represented on its website: "The Honda Accord is the first mid-size sedan to offer front, front-side and side curtain airbags as standard equipment. Accord earned a 5-star

- 61 -

frontal impact rating from the U.S. government and a frontal "Best Pick" from the Insurance Institute for Highway Safety (IIHS)."

- In 2007, Honda also represented on its website: "Every Honda and Acura vehicle begins with a basic structure designed to be fundamentally safe, but we add advanced technology as standard equipment that can help the driver maintain control of the vehicle."

- In 2015, Honda represented on its website: "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

- In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . .  Safety has been top of mind with Acura engineers since day one. . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

d. **MAZDA**:

- In 2004, Mazda represented in brochures that its cars possessed "inspiring performance" and "reassuring safety features."

- In 2005, Mazda represented on its website: "in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety."

- In 2015, Mazda represented on its website: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research and development into safety technologies based on the Mazda Proactive Safety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies…."

e.  **NISSAN/INFINITI**:

- In 2005, Nissan represented in brochures that its vehicles possessed "an entire set of safety features to help protect you from the unavoidable. Including steel reinforcements, guard beams and advanced airbags that will help safeguard you and your passengers in the event of an accident."

- In 2015, Nissan represented on its website: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make…."

f.  **SUBARU**:

- 63 -

- In 2005, Subaru represented on its website: "Features like seatbelts with front pretensioners and force limiters, crumple zones, side-impact beams, front air bags and a Ring-Shaped Reinforcement Frame aid in minimizing the effects of a collision."

- In 2005, Subaru represented in its brochures: "THE SUBARU DRIVING EXPERIENCE EVOKES MANY EMOTIONS. Confidence should always be one of them. Which is why every Subaru is engineered according to the principles of "Active Driving/Active Safety."

- In 2005, Subaru represented in its brochures: "Advanced front air bags, including passenger-side dual-stage deployment, help provide optimal protection for the driver and front passenger."

- In 2015, Subaru represented on its website: "Safety drives Subaru design."

g. **TOYOTA/LEXUS**:

- In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."

- In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

- 64 -

## V. Automotive Recyclers Purchased Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale

191.    Generally, automotive recycling businesses purchase vehicles from a number of sources, including insurance salvage auctions, tow operators, charities and the public.

192.    Automotive recycling businesses calculate the purchase price for individual vehicles based, in part, on the presence and condition of the automotive parts contained in the vehicle.

193.    Automotive recycling businesses store and maintain the airbags and then resell them to consumers, automotive repair shops, automotive dealerships, wholesalers or other automotive recyclers.

194.    Here, Plaintiff and Class members purchased Class Vehicles, which contained Takata airbags, at insurance salvage auctions and from tow operators, charities and the public.

195.    Plaintiff owns over 1,000 airbags that are currently subject to Takata-related recalls.

196.    On information and belief, Plaintiff has purchased at least the Class Vehicles identified in Exhibit A and currently owns at least the airbags from those Class Vehicles.

197.    Automotive recyclers calculated the purchase prices for each of the Class Vehicles based on the demand for the vehicles and their constituent parts.

198.    After automotive recyclers purchased the Class Vehicles containing the Takata airbags, automotive recyclers transported the vehicles to their facilities. An inspection of the airbags by automotive recyclers would not have revealed the Inflator Defect.

199.    At the time that automotive recyclers purchased the Class Vehicles, automotive recyclers had a reasonable expectation that Defendants would abide by federal, state, and common law obligations to affirmatively disclose known defects in a timely manner.

200.    This did not happen and, as a result, automotive recyclers purchased the Class Vehicles containing Takata airbags for amounts greater than their worth.

201.    As detailed above, national and regional media outlets around the country have reported extensively about the defective airbags in recent months, raising public awareness of their defect and its safety implications. The value of the Takata airbags in the Class Vehicles has been negatively impacted and the resale value of these airbags is effectively zero. Moreover, the resale value of the other parts in the Class Vehicles has been similarly impacted. Finally, Plaintiff and members of the Class have been injured by the costs of storing, maintaining, and otherwise disposing of the defective Takata airbags.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

202.    Upon information and belief, Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Defendant Honda has known of the Inflator Defect in the Takata airbags in Honda's vehicles since 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in Takata's airbags no later than 2008. Defendants have concealed from or failed to notify Plaintiff, Class members, and the public of the full and complete nature of the Inflator Defect.

203.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

- 66 -

204.     Any applicable statute of limitations has therefore been tolled by Defendants'

knowledge, active concealment, and denial of the facts alleged herein, which behavior is

ongoing.

**Estoppel**

205.     Defendants were and are under a continuous duty to disclose to Plaintiff and Class

members the true character, quality, and nature of the Class Vehicles.  They actively concealed

the true character, quality, and nature of the vehicles and knowingly made misrepresentations

about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class

members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or

active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying

on any statute of limitations in defense of this action.

**Discovery Rule**

206.     The causes of action alleged herein did not accrue until Plaintiff and Class

members discovered that their vehicles had the Defective Airbags.

207.     Plaintiff and Class members, however, had no realistic ability to discern that the

vehicles were defective until – at the earliest – after their vehicles were recalled.  And even then,

Plaintiff and Class members had no reason to discover their causes of action because of

Defendants' active concealment of the true nature of the defect.

***American Pipe* Tolling**

208.     A putative class action suit on behalf of automotive recyclers was brought against

Defendants on February 10, 2015. *Automotive Dismantlers and Recyclers Assoc., Inc. v. Takata

Corp. et al.,* 1:15-cv-20520-FAM (Moreno, J.).  At the time it was brought, Plaintiff and the

other Class members in this case were part of the classes alleged in *Automotive Dismantlers* action.

209.    Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Plaintiff and other Class members were tolled from at least February 10, 2015.

## CLASS ACTION ALLEGATIONS

210.    The Class's claims all derive directly from a single course of conduct by Takata and the Vehicle Manufacturer Defendants. This case is about the responsibility of Takata and the Vehicle Manufacturer Defendants, at law and in equity, for their knowledge, their conduct, and their products. Takata and the Vehicle Manufacturer Defendants have engaged in uniform and standardized conduct toward the Class. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted, the same legal standards govern. Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims. Accordingly, Plaintiff brings this lawsuit as a class action on its own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

- 68 -

**Numerosity and Ascertainability**

211.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Moreover, there are thousands of Automotive Recycler Class Members in the United States and hundreds in each State.  Accordingly, individual joinder of all Class members is impracticable.

212.    The Class is ascertainable because its members can be readily identified using licensing records, registration records, sales records, production records, and other information kept by Takata and the Vehicle Manufacturer Defendants or third parties in the usual course of business and within their control.  Plaintiff anticipates providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

213.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for the Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

       a.    Whether the Class Vehicles suffer from the Inflator Defect;

       b.    Whether the Class Vehicles and their constituent parts have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

       c.    Whether the defective Takata airbags in the Class Vehicles have suffered a diminution of value;

       d.    Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

- 69 -

e.     Whether the defective nature of the Class Vehicles constitutes a material fact reasonable businesses would have considered in deciding whether to purchase a Defective Vehicle;

f.     Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiff and Class members;

g.     Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

h.     Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiff and Class members to act to their detriment by purchasing the Class Vehicles and the defective Takata airbags contained therein;

i.     Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

j.     Whether Defendants misrepresented that the Class Vehicles were safe;

k.     Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

l.     Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable business;

m.     Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable business could consider them important in purchasing, selling, maintaining, or operating such vehicles;

- 70 -

n.    Whether Plaintiff and the Class are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective;

o.    Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiff and the Class;

p.    Whether Defendants have been unjustly enriched by their conduct;

q.    Whether Plaintiff and the Class are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

r.    Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.    What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

t.    How such penalties should be most equitably distributed among Class members;

**Typicality**

214.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by Takata and the Vehicle Manufacturer Defendants.  The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

**Adequate Representation**

215.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting class actions, including actions involving defective products.

- 71 -

216. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiff nor its counsel have interests adverse to those of the Class.

**Superiority**

217. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants Takata and the Vehicle Manufacturer Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

218. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Takata and the Vehicle Manufacturer Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

219. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

220. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared

to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

221. Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

222. The Class expressly disclaims any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiff is informed and believes that injuries suffered in crashes as a result of the defective airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiff and the Class.

## REALLEGATION AND INCORPORATION BY REFERENCE

223. Plaintiff realleges and incorporates by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF 18 U.S.C. § 1962(c), THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), AGAINST THE TAKATA DEFENDANTS**

224. This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against the Takata Defendants.

225. The Takata Defendants are all "persons" under 18 U.S.C. § 1961(3).

226. The Takata Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Takata RICO Enterprise through a pattern of racketeering activity.

227. Plaintiff and Class members are "person[s] injured in his or her business or property" by reason of the Takata Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Takata RICO Enterprise

228. The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Takata RICO Enterprise:

      a.    The Takata defendants, who designed, manufactured, and sold millions of defective airbags knowing that they contained the inflator defect, the scope and nature of which

- 74 -

they concealed from and misrepresented to the public and regulators for more than a decade and still refuse to entirely acknowledge.

b. <u>The Takata defendants' officers, executives, and engineers</u>, who have collaborated and colluded with each other and with other associates in fact in the Takata RICO Enterprise to deceive plaintiff and class members into purchasing dangerous and defective vehicles, and actively concealing the danger and inflator defect from plaintiff and class members.

c. <u>The vehicle manufacturer defendants</u>, who purchased the defective airbags from the Takata defendants, equipped their vehicles with the defective airbags, and falsely and inaccurately represented that their vehicles were safe, thereby deceiving plaintiff and class members.

d. <u>Dealerships that sell vehicles manufactured by the vehicle manufacturer defendants</u>, which sold or leased the class vehicles containing defective airbags to plaintiff and class members, and continue to install replacement airbags manufactured by Takata into recalled class vehicles that suffer from the same inflator defect that plagues the removed airbags.

229. The Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose. The Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

230. While the Takata Defendants participated in the conduct of the Takata RICO Enterprise, they had an existence separate and distinct from the Takata RICO Enterprise. Further, the Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which the Takata Defendants have engaged.

231. At all relevant times, the Takata Defendants operated, controlled or managed the Takata RICO Enterprise, through a variety of actions. The Takata Defendants' participation in the Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud

because the Takata Defendants manufactured the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

232. The members of the Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Takata RICO Enterprise's members. The members of the Takata RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Takata RICO Enterprise benefited from the common purpose: the Vehicle Manufacturer Defendants sold or leased more Class Vehicles, and received more for those vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; the Takata Defendants sold more Defective Airbags to the Vehicle Manufacturer Defendants than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiff and Class members.

## Pattern of Racketeering Activity

233. The Takata Defendants conducted and participated in the conduct of the affairs of the Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2004 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

234. For the Takata Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order to sell more airbags, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the Inflator Defect. By concealing the scope and nature of the Inflator Defect in its millions of Defective Airbags, the Takata

- 76 -

Defendants also maintained and boosted consumer confidence in the Takata brand and the brands of the Vehicle Manufacturer Defendants, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Takata Defendants sell more airbags than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

235.    As detailed in the General Factual Allegations, the Takata Defendants were well aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally subjected Plaintiff and Class members to those risks or consciously disregarded those risks in order to maximize their profits.  Moreover, once the Inflator Defect began maiming and killing vehicle occupants, the Takata Defendants secretly engaged in testing that revealed the dangers associated with the Inflator Defect, but then destroyed the evidence of their testing to continue to conceal the nature and scope of the Inflator Defect.

236.    To further the scheme to defraud, the Takata Defendants repeatedly misrepresented and concealed the nature and scope of the Inflator Defect.  The Takata Defendants repeatedly described the defect as a contained and corrected manufacturing defect that only manifested itself in certain areas of the country, when in fact the Takata Defendants knew that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag and manifests itself across the country.

237.    To further the scheme to defraud, the Takata Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling it to escape investigation and costs associated with recalls for more than a decade.

238.    To further the scheme to defraud, the Takata Defendants would promote and tout the safety, reliability, and quality of their airbags while simultaneously concealing the nature and scope of the Inflator Defect.

239.    To further the scheme to defraud, the Takata Defendants permitted or caused the Vehicle Manufacturer Defendants to promote the safety, reliability, and quality of the airbags

- 77 -

contained in Class Vehicles while simultaneously concealing the nature and scope of the Inflator Defect.

240.    To carry out, or attempt to carry out the scheme to defraud, the Takata Defendants have conducted or participated in the conduct of the affairs of the Takata RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.    The Takata defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Takata website, communications with NHTSA, statements to the press, and communications with other members of the Takata RICO enterprise, as well as advertisements and other communications to the Takata defendants' customers, including plaintiff and class members; and

b.    The Takata defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

241.    The Takata defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a.    As early as the 1990s and in subsequent years, the Takata Defendants transmitted, or caused to be transmitted (which hereinafter also means that the Takata Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Japan and/or Michigan and/or Washington, D.C., communications concerning the instability and volatility of ammonium nitrate, recognizing that the casing of inflators using the compound as a propellant "might even blow up."

- 78 -

b.     In mid-to-late 2004, following the May 2004 accident in Alabama in which a defective airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted or caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform secret testing that revealed the Inflator Defect.

c.     In mid-to-late 2004, following the May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in japan and/or Michigan to the offices of Defendant Honda in California and offices of regulators in Washington, D.C., representations that the rupture was an "anomaly."

d.     In September of 2007, the Takata Defendants caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform testing, the results of which they misrepresented showed that a manufacturing defect was solely responsible for exploding airbag incidents, thereby concealing the nature and scope of the Inflator Defect.

e.     In November 2008, the Takata Defendants caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., regulatory filings stating that the approximately 4,000 vehicles subject to its 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

f.     In December 2008, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life

and limb, and concealed the scope and nature of the inflator defect. Owners are merely advised to make an appointment to have their vehicle repaired, with no sense of urgency. In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

g.     On July 29, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the 08v-953 recall. In this report, Honda stated "[t]he VIN range reflects all possible vehicles that could potentially experience the problem." In light of the 100-fold recall expansion, and what Plaintiffs believe Honda knew about Takata's internal difficulties dealing with the recall, this statement was false and concealed the nature and scope of the Inflator Defect. Honda's chronology lists three "unusual deployments"—a euphemistic way of describing Ashley Parham's death in May 2009, Jennifer Griffin's shrapnel injuries in June 2009, and one other incident. This regulatory filing was misleading and served to conceal and/or minimize the threats posed by the defective airbags.

h.     On September 16, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. information concerning safety recalls 08v-593 and 09v-259. This letter was co-drafted by Honda and Takata. NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall. Among other things, Honda and Takata explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall. But Honda and Takata fraudulently omitted that one of those deployments caused Ashley Parham's death. Also, Honda and Takata claimed that the manufacturing problem was limited to only one high-precision compression press. Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving for both Honda

- 80 -

and Takata. In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant. Furthermore, Takata and Honda omitted the existence of the secret testing in 2004 and the negative results of those tests. Once again, NHTSA, and by extension the public, were deprived of accurate and complete information. As a result of this letter, the ODI closed its investigation into these two recalls. The Takata Defendants thereby concealed the nature and scope of the Inflator Defect.

i. On February 9, 2010, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem." Honda's "chronology" was false and misleading because it did not mention any injuries. Honda's explanation of the defect—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what the Takata Defendants knew, or at least should have known in light of the extensive problems at Takata's Monclova, Mexico plant.

j. On February 19, 2010, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to the ODI's November 20, 2009 letter seeking more information about recalls 08v-593 and 09v-259 conducted by Honda. Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08v-593 and 09v-259 to any customers other than Honda." This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made. This statement concealed the nature and scope of the Inflator Defect.

k. On April 27, 2011, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from

- 81 -

Honda's offices in California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that the recall covered "all possible vehicles" with the problem. As before, the letter to owners and lessees did not sufficiently raise a sense of urgency. This statement concealed the nature and scope of the Inflator Defect.

l. On April 11, 2013, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was limited to inflators produced at a specific plant between certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

m. In April or May 2013, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Toyota's offices in California to Plaintiff Shader in Florida a recall notice stating that the front passenger airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication, and several follow-up communications that the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, concealed the nature and scope of the Inflator Defect and inaccurately assured Plaintiff Shader that "the remedy is complete on your vehicle."

n. On June 11, 2014, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata support for regional field actions to address potential inflator issues." Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the virgin islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." Takata misleadingly omitted Ashely Parham's death in Oklahoma in

- 82 -

May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia. By focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

o. In September 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from BMW's offices in New Jersey to Plaintiff Gunther in Florida a recall notice stating that the front passenger airbag should be replaced due to a defect. This notice misleadingly indicates that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

p. In October 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to Plaintiff Archer in Hawaii, a recall notice stating that the front driver's side and/or passenger airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

q. In late 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Nissan's offices in Tennessee to Plaintiff Liberal in Florida a recall notice that the front passenger airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

r. In late 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Chrysler's offices in Michigan to Plaintiff Herron in Florida a recall notice stating that the front driver's side and/or passenger airbag should be replaced due to a defect. This notice misleadingly

- 83 -

suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

s.  In November 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from ford's offices in Michigan to Plaintiff Sinclair in Florida a recall notice that the front driver and/or passenger airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

t.  In April 2015, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to Plaintiff Severio in Louisiana a recall notice that the driver's side airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

u.  To this day, the Takata Defendants continue to transmit, or cause to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan, advertisements and communications with the public and NHTSA misrepresenting that the replacement airbags are safe and reliable, when in fact they too suffer from the Inflator Defect.

242.  The Takata Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as a result of the Takata Defendants' intentional conduct. Plaintiff, Class members, and federal regulators, among others, relied on the Takata Defendants' material misrepresentations and omissions.

243.  As described throughout this Complaint, the Takata Defendants engaged in a pattern of related and continuous predicate acts for more than a decade. The predicate acts

constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

244. The predicate acts all had the purpose of generating significant revenue and profits for the Takata Defendants at the expense of Plaintiff and Class members. The predicate acts were committed or caused to be committed by the Takata Defendants through their participation in the Takata RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiff's and Class members' funds and avoiding the expenses associated with remediating the Inflator Defect.

245. By reason of and as a result of the conduct of the Takata Defendants, and in particular, its pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.      overpayment for purchased Class Vehicles, in that Plaintiff and Class members believed they were paying for vehicles with safe airbag systems and obtained vehicles with anything but, and were deprived of the benefit of their bargain;

b.      overpayment for purchased Class Vehicles and the airbags contained therein, in that the airbags are essentially valueless and the Automotive Recyclers are now unable to sell them; and

c.      the value of the Class Vehicles has diminished, thus reducing their resale value.

246. The Takata Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

- 85 -

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d), THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), AGAINST THE TAKATA DEFENDANTS AND THE HONDA DEFENDANTS

247.    This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against the Takata Defendants and the Honda Defendants.

248.    In addition to the General Factual Allegations re-alleged and incorporated herein through the general Reallegation and Incorporation by Reference Paragraph above, Plaintiffs re-allege and incorporate the allegations set forth in Count I.

249.    At all relevant times, the Takata Defendants and the Honda Defendants were associated with the Takata RICO Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Takata RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

250.    Over the course of the past decade, the Honda Defendants and Takata Defendants shared information about injurious airbag deployments—jointly and secretly—investigated the possible causes of those deployments, delayed and/or prevented the release of inculpatory information, misled regulatory authorities, and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed. The Honda Defendants' and Takata Defendants' close cooperation on issues surrounding the Inflator Defect and joint participation in predicate acts described below is evidence of the conspiracy.

## Overt Acts

251.    The Takata Defendants and Honda Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.

- 86 -

252. More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Honda and Takata:

a. After an airbag in a 2002 Honda Accord exploded in Alabama in 2004, Honda and Takata investigated the incident. Honda stated that, after the accident, it "immediately shared all available information with the airbag supplier [Takata]." Honda claimed that Takata had provided a reasonable explanation of the defect as an "anomaly" because Takata claimed it could not find a cause for the explosion, and neither studied the matter any further. Yet, by this time Honda was aware of the Honda Passport recall in February 2001 necessitated by the Defective Airbags, and Takata was aware of faulty welding and rust in the inflators produced at its plant in Monclova, Mexico, which Takata engineers believed could cause the inflators to fail. Also, between 2001 and 2003 various internal Takata reports titled "potential failures" show that Takata struggled with at least 45 inflator problems. Moreover, in 2002 Takata's Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's quality control limit. In light of this accumulated knowledge, Honda's and Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

b. Also in 2004, Takata concealed and destroyed negative results from secret airbag tests it conducted in response to the explosion in Alabama. Over weekends and holidays during the summer of 2004 at Takata's American headquarters in Auburn Hills, Michigan, Takata conducted secret tests on 50 airbags it had retrieved from scrapyards. The tests were conducted by Al Bernat, Takata's then-vice president of engineering. In two of the airbags, the steel inflators cracked. According to employees involved in the testing, Takata engineers began designing possible fixes. But Takata executives ordered the lab technicians to delete the test data

- 87 -

from company computers and to dispose of the airbag inflators in the trash. Prototypes of design alternatives were also trashed. According to a former Takata employee, "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.' It was not standard procedure." In regulatory filings, Takata has since stated that it began testing the problematic airbags in 2008—four years after these secret tests. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and Honda and Takata were by 2004 communicating about the defective inflators, Plaintiffs allege, upon information and belief, that Honda was aware of Takata's secret testing.

        c.      Between February 2007 and June 2007, Honda reported three airbag ruptures, all causing injuries, to Takata. Honda decided not to order a recall but rather to await the results of a "failure mode analysis" to be performed by Takata. Honda and Takata again chose to keep vitally important, safety-related information between only the two of them. In light of what the two companies knew about the Defective Airbags, this "failure mode analysis" was nothing more than an attempt to divert the attention of regulators and the public. Honda and Takata had no need for further analysis; they already knew the airbags were defective.

        d.      In September 2007, Honda began collecting inflators returned to dealers, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrapyards for the same purpose. Takata began what turned out to be a year-long study of the Inflator Defect.

        e.      In September 2008, Takata completed the year-long study and determined that moisture was at the root of the defect. In light of the serious safety risks of which Takata and Honda were aware, that the study took an entire year and that Honda did not compel Takata to complete its investigation any faster were wholly unreasonable and evidence of recklessness.

Moreover, there was no need for this study in the first place; Honda and Takata already knew the airbags were defective.

f.     On September 16, 2009, Honda and Takata jointly drafted a letter to NHTSA's ODI in response to the ODI's request for additional information concerning safety recall 09V-259.  The ODI had requested an explanation about why Honda's recall on July 8, 2010 (Recall No. 09V-259, 440,000 vehicles) had expanded by almost 100-fold the number of vehicles recalled on November 11, 2008 (Recall No. 08V-593,  3,940 vehicles).  Although signed by Honda's managing counsel, the letter clearly indicates joint drafting, as it is written in the "we" form and defines "we" as "Honda and TK Holding, Inc."  In spite of what Honda and Takata both knew by this time, the letter asserts that the defects were from a limited production run and were caused by a lone faulty high-compression production press.  The letter did not mention the numerous problems that Takata's Monclova, Mexico plant had been suffering for years, which underscored the volatility and instability of the ammonium nitrate propellant; nor did it mention Takata's secret airbag tests in 2004.  Thus, Honda and Takata, in concert, knowingly and consciously omitted and withheld crucial information from government regulators in order to prevent regulatory action that likely would have resulted in a broader recall and possibly regulatory sanctions.

g.     Honda and Takata have jointly settled at least one personal injury lawsuit arising from a Defective Airbag.  On May 20, 2010, Kristy Williams filed a personal injury action against both Honda and Takata in Georgia State Court in Clayton County, Georgia. Shrapnel from an exploding Takata airbag in Ms. Williams's 2001 Honda Civic severed her carotid artery, and she survived only because she applied pressure with her fingers to stem the arterial bleeding.  Honda and Takata entered into a confidential settlement with Ms. Williams,

and the case was dismissed without prejudice in January 2011. This settlement demonstrates the joint desire and effort by Takata and Honda to conceal the existence of the Inflator Defect and the risks posed by it from regulators and from the public, and joint action to achieve that end. Although this lawsuit occurred after the recent wave of recalls began in November 2008, the suit preceded the massive Honda recall expansions of December 2011 (Recall No. 11V-260), April 2013 (Recall No. 13V-132), and June 2014 (Recall Nos. 14V-349, 14V-351, and 14V-353).

        h.     In September 2011, Honda and Takata initiated a joint analysis into an "outside of range" incident that occurred on August 1, 2011.

        i.     At no point did either Takata or Honda "break rank" with the other to give a full reporting to government regulators or to the public, even though several people had been killed and dozens injured. Only when backed against the proverbial wall did they start to release a trickle of information, leading to a series of seemingly ever-expanding recalls, commencing in November 2008 and continuing to the present.

    253.    Honda and Takata agreed to and did conduct and participate in the conduct of the Takata RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiff and Class members, as more fully described in the prior Count.

    254.    As a direct and proximate result of Honda's and Takata's conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

        a.     overpayment for purchased Class Vehicles, in that Plaintiff and Class members believed they were paying for vehicles with safe airbag systems and obtained vehicles with anything but, and have been deprived of the benefit of their bargain;

b.    overpayment for purchased Class Vehicles and the airbags contained therein, in that the airbags are essentially valueless and the Automotive Recyclers are now unable to sell them; and

c.    the Class Vehicles' value has diminished, thus reducing their resale value.

255.    Had Takata and/or Honda been entirely forthcoming with NHTSA and with the public in a timely manner about the vast scope of the Inflator Defect and the grave risks it posed to countless vehicle occupants, as was their duty, Plaintiff and Class members would not have suffered these harms. Takata's and Honda's conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension, and was committed with reckless indifference to the truth if not the outright intent to deceive.

256.    Honda's and Takata's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiff and Class members to treble damages under 18 U.S.C. § 1964(c).

257.    The Honda and Takata Defendants' violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiff and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

**COUNT III**

**VIOLATION OF THE LANHAM (TRADEMARK) ACT, 15 U.S.C. §§ 1501 *et seq.***

258.    This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against all Defendants.

- 91 -

259.     The Lanham Act, 15 U.S.C. § 1125(a), entitled "False designation of origin, false descriptions, and dilution forbidden," provides in pertinent part:

Civil action

(1)     Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B)     in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

260.     Takata and the Vehicle Manufacturer Defendants used and/or continue to use in commerce false or misleading descriptions of fact, and/or false or misleading representations and/or omissions of fact, which misrepresented, and were likely to cause and/or did cause confusion and mistake or to deceive, regarding Takata's defective airbags, the safety of the defective airbags and the Class Vehicles, the scope and cause of the Inflator Defect, and the extent of unreasonable danger of death or personal injury related to the Inflator Defect.

261.     As detailed more fully above, the Vehicle Manufacturer Defendants' representations, omissions, statements, and false commentary have included misleading representations about the safety of the Class Vehicles and the scope of the Inflator Defect to:

a.     The public and Class Vehicle purchasers, both in the form of advertising and responding to initial recall concerns;

b.     The U.S. Congress;

c.     The media; and

- 92 -

d.    Federal regulators.

262.    The Vehicle Manufacturers' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable", despite their knowledge of the Inflator Defect or their failure to reasonably investigate it. At all relevant times, in advertisements and promotional materials, the Vehicle Manufacturer Defendants continuously maintained that their vehicles were safe and reliable.

263.    Examples of the Vehicle Manufacturers' safety and reliability misrepresentations, from 2000 through the present, include but are not limited to the following:

a. **BMW**:
- In 2005 BMW represented on its website: "Driver's and passenger's front airbag supplemental restraint system (SRS) with 'smart' dual-threshold, dual-stage deployment and sensor to help prevent unnecessary passenger's airbag deployment."
- In 2008 BMW represented on its website: "The driver and front passenger airbags provide effective protection for the head and upper-torso area, preventing contact with the steering wheel and dashboard. In a head-on collision, you have the best possible protection."
- In 2008 BMW represented on its website: "The principle behind the function of the front airbags for driver and passenger is very simple: in the event of an impact with a force greater than the safe threshold, the airbag sensors activate a substance that causes the airbags to instantly inflate. Within a fraction of a second, the airbags form a protective cushion over the steering wheel and dashboard, significantly reducing the risk of cranial and upper body injuries."
- In 2015 BMW represented on its website: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

b. **Ford:**
- In 2006 Ford represented in brochures that its cars possessed "up-to-the-minute safety and security systems help protect you and your passengers out there on the road."
- In 2006 Ford also represented in brochures that its cars contained a: "Personal Safety System®," which "enhances protection for the driver and

- 93 -

front passenger in certain frontal collisions. The system customizes the deployment of the dual-stage front airbags based on several criteria, including the driver's seat position, whether the front safety belts are in use, the amount of pressure exerted on the front-passenger's seat, and the overall severity of the impact."

- In 2015 Ford represented on its website: "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

c. **Honda:**

- In 2002, Honda represented on its website: "Having already earned top safety ratings with its quadruple five-star front- and side-impact crash test ratings, the 2002 Odyssey now offers the latest generation of airbag systems from Honda. Driver's and front passenger's dual stage airbags (SRS) along with driver's and front passenger's side airbags are now standard equipment on all models - yet another minivan first… Both front airbags have a dual-stage inflator that can deploy the airbag at one of two rates depending on the severity of the crash… The front passenger's side airbag has an automatic cutoff system that is designed to prevent side airbag deployment if a child (or small statured adult) leans into the side airbag deployment path. Once the child returns to an upright position, the side airbag will be able to deploy and provide protection in the event of a side impact… Building on the standard anti-lock braking system (ABS), new standard rear disc brakes result in improved stopping performance with higher resistance to brake fade and a more responsive brake pedal feel. Amber rear turn signals have been added, which help other drivers differentiate the indicators with increased clarity."

- In 2002, Honda represented in a commercial: "5-stars of frontal collision tests… that's a safe car. Safe, get it through your head. To see what safe really means, take a look at a close look at the 2002 civic from Honda."

- In 2002, Honda represented in brochures: "Honda's commitment to safe driving is in evidence throughout every vehicle… Every new vehicle comes with dual front airbags (SRS), most using a dual stage design... All designed to keep you and yours out of harm's way."

- In 2004, Honda represented in brochures: "A glance at the crash-test data posted by the U.S. government's National Highway Traffic Safety Administration reveals a galaxy of 5-star ratings for Honda cars and trucks. In fact, five of our models to date – Accord Coupe, Civic Coupe, CR-V, Odyssey and Pilot – have earned the highest NHTSA crash-test

- 94 -

ratings in frontal and side impact testing… It's a solid testament to our emphasis on safety."

- In 2007, Honda represented on its website: "Through innovative original research, Honda has created advanced airbags that offer outstanding levels of occupant protection."
- In 2007, Honda also represented on its website: "Honda led the industry through advances such as driver and front passenger airbags with "dual output inflators" that adjust the deployment force of the airbags to the severity of the crash."
- In 2007, Honda also represented on its website: "The Honda Accord is the first mid-size sedan to offer front, front-side and side curtain airbags as standard equipment. Accord earned a 5-star frontal impact rating from the U.S. government and a frontal "Best Pick" from the Insurance Institute for Highway Safety (IIHS)."
- In 2007, Honda also represented on its website: "Every Honda and Acura vehicle begins with a basic structure designed to be fundamentally safe, but we add advanced technology as standard equipment that can help the driver maintain control of the vehicle."
- In 2015, Honda represented on its website: "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."
- In 2015, Honda represented on its website: "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . .  Safety has been top of mind with Acura engineers since day one. . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

d. **Mazda**:
- In 2004, Mazda represented in brochures that its cars possessed "inspiring performance" and "reassuring safety features."
- In 2005, Mazda represented on its website: "in every configuration, you'll enjoy Mazda's legendary performance, function, style and safety."
- In 2015, Mazda represented on its website: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research and

- 95 -

development into safety technologies based on the Mazda Proactive Safety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies…."

e. **Nissan/Infiniti**:
- In 2005, Nissan represented in brochures that its vehicles possessed "an entire set of safety features to help protect you from the unavoidable. Including steel reinforcements, guard beams and advanced airbags that will help safeguard you and your passengers in the event of an accident."
- In 2015, Nissan represented on its website: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make…."

f. **Subaru**:
- In 2005, Subaru represented on its website: "Features like seatbelts with front pretensioners and force limiters, crumple zones, side-impact beams, front air bags and a Ring-Shaped Reinforcement Frame aid in minimizing the effects of a collision."
- In 2005, Subaru represented in its brochures: "THE SUBARU DRIVING EXPERIENCE EVOKES MANY EMOTIONS. Confidence should always be one of them. Which is why every Subaru is engineered according to the principles of "Active Driving/Active Safety."
- In 2005, Subaru represented in its brochures: "Advanced front air bags, including passenger-side dual-stage deployment, help provide optimal protection for the driver and front passenger."
- In 2015, Subaru represented on its website: "Safety drives Subaru design."

g. **Toyota/Lexus**:
- In 2002, Toyota represented on its website: "With safety features like dual front air bags, crumple zones and 3-point seatbelts in every seating position. So gather up all the hikers -- big and small -- and head out. Way out."
- In 2015, Toyota represented on its website: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

264.    In addition to false and misleading statements and omissions to consumers, the Vehicle Manufacturers also made false and misleading statements to federal regulators and media regarding the scope and cause of the Inflator Defect as set forth above.

- 96 -

265.    Takata is contributorily liable for the Vehicle Manufacturers' false statements and omissions.

266.    Takata knew or reasonably should have known about the Vehicle Manufacturers' false misrepresentations and omissions regarding the safety of the Class Vehicles and Takata's defective airbags.

267.    Takata contributed to the Vehicle Manufacturers' false advertising and knowingly induced and caused it through Takata's failure to publicly acknowledge the Inflator Defect. Takata not only allowed the misrepresentations and omissions to be disseminated without correction because Takata benefitted from them through continued business from the Vehicle Manufacturers, but Takata also materially participated in such misrepresentations and omissions by allowing such representations to be made.

268.    In addition to participating in the Vehicle Manufacturers' misrepresentations, Takata also made its own materially false statements that misrepresented, and created confusion and likelihood of mistake as to the nature, characteristics, and qualities of its airbags, the root cause and scope of Inflator Defect, and the extent of unreasonable danger of death or personal injury related to the Inflator Defect.

269.    Takata's misrepresentations, omissions, statements, and commentary have included statements made to Congress, federal regulators, the media, and the public as more fully alleged in the paragraphs above.

270.    Takata's misrepresentations also included statements to NHTSA and the public that the Inflator Defect was limited to "a specific production process" and by providing vague and misleading information about the seriousness of the problem as more fully alleged in above. For example, Takata falsely represented that the Inflator Defect only manifested itself in certain

areas of the country, when in fact the Takata Defendants knew that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag and manifests itself across the country.

271. Takata also made material misrepresentations regarding the completeness of each of the multiple recalls as more fully alleged above.

272. Each of these statements are materially false statements that misrepresented and created confusion and likelihood of mistake as to the nature, characteristics, and qualities of its airbags, the root cause of Inflator Defect, the value of the vehicles in which its airbags were installed, the number of affected vehicles, and the extent of unreasonable danger of death or personal injury related to the Inflator Defect.

273. Takata's and the Vehicle Manufacturer Defendants' misleading representations of fact relating to the Defective Airbags caused actual injury to automotive recyclers and other industry participants.

274. Takata's and the Vehicle Manufacturer Defendants' statements were made in commercial advertising or in promotion of its Defective Airbags.

275. Takata and the Vehicle Manufacturer Defendants' had an economic motivation for making their statements, as they were incentivized to sell as many airbags and vehicles as possible and minimize lost profits associated with Defective Airbags.

276. Takata's and the Vehicle Manufacturer Defendants' misleading statements had a material effect on the purchasing decisions of automotive recyclers. These omitted and concealed facts were material because they would be relied on by a reasonable business purchasing a new or used motor vehicle, and because they directly impact the value of the Class

- 98 -

Vehicles purchased by Plaintiff and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products are material concerns to a purchaser. Plaintiff and Class members trusted Defendants not to sell or fail to recall vehicles that were defective or that violated federal law governing motor vehicle safety.

277. Takata's and the Vehicle Manufacturer Defendants' statements were widely distributed, which is, at least, sufficient to constitute promotion within the automotive recycler industry.

278. Thus, Takata's and the Vehicle Manufacturer Defendants' misleading representations and statements are and/or were material and the direct cause of the injuries herein described.

279. Takata's and the Vehicle Manufacturer Defendants' products travel or traveled in interstate commerce.

280. Plaintiff and the other Class members have and continue to be damaged and injured by Takata's and Vehicle Manufacturer Defendants' material misrepresentations and as a result of the false and misleading statements. Plaintiff and other Class members were injured and continue to suffer injury to, among other things, their property and possessory rights in the defective airbags, as well as the negative market price impact on the resale value of the Defective Airbags and parts of the Class Vehicles, which result in lower revenues and profits, as well as lost business and increased expenses. Those economic injuries are likely to continue in the future.

281. Takata's and the Vehicle Manufacturer Defendants' representations, statements and commentary as more fully set forth herein were made with knowledge or reckless disregard of their falsity and the resulting risk and damage to the Plaintiff and other Class members.

- 99 -

282. Takata's and the Vehicle Manufacturer Defendants' acts constitute the use of false descriptions and false representations in interstate commerce in violation of § 43(a) of the Lanham Act and entitle Plaintiff, individually and on behalf of the other Class members, to recover damages, disgorgement of Defendants' profits, the costs of this action, and attorney's fees.

**COUNT IV**

**FRAUDULENT CONCEALMENT**

283. This claim is brought individually and on behalf of the Nationwide Automotive Recycler Class against all Defendants.

284. As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

285. Defendants knew these representations were false when made.

286. Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

287. Defendants took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

288. On information and belief, Takata still has not made full and adequate disclosure, continues to defraud Plaintiff and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

289. Defendants had a duty to disclose the Inflator Defect because they:

a. Had exclusive and/or far superior knowledge and access to the facts than Plaintiff and Class members, and knew that the facts were not known to or reasonably discoverable by Plaintiff and the Class;

b. Intentionally concealed the foregoing from Plaintiff; and

c. Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiff that contradicted these representations.

290. These omitted and concealed facts were material because they would be relied on by a reasonable consumer purchasing a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased by Plaintiff and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products are material concerns to a consumer. Plaintiff and Class members trusted Defendants not to sell or fail to recall vehicles that were defective or that violated federal law governing motor vehicle safety.

291. Takata concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by Takata and reasonably expected by consumers. Vehicle Manufacturer Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that its vehicles were capable of performing safely, as represented by them and reasonably expected by consumers.

292. Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect their profits, and to avoid recalls that would their brands' image and cost them money. Defendants concealed these facts at the expense of Plaintiff and the Class.

293.     Plaintiff and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

294.     Had they been aware of the Defective Airbags and Defendants' callous disregard for safety, Plaintiff and Class members would have paid less for their Class Vehicles.  Plaintiff and the Class did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

295.     Because of the concealment or suppression of the facts, Plaintiff and the Class sustained damage because they own vehicles that diminished in value as a result of Defendants' concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by their conduct.

296.     The value of all Class Vehicles has diminished as a result of Defendants' fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles or the parts used to repair them, let alone pay what otherwise would have been fair market value for the vehicles or the parts to repair them.

297.     Accordingly, Plaintiff and the Class have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment at the time of purchase, the diminished value of the defective airbags and the Class Vehicles and their constituent parts, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

298.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching themselves.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and

effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

A.      An order certifying the proposed Class, designating Plaintiff as the named representative of the Class, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B.      A declaration that the airbags in Class Vehicles are defective;

C.      A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.      An award to Plaintiff and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

F.      An award to Plaintiff and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class Members' Class Vehicles, can be made and

paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly

traceable to the recall of the vehicles and correction of the Defective Airbags;

      H.     A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class

Members, all or part of the ill-gotten profits they received from the sale or lease of the Class

Vehicles, or make full restitution to Plaintiff and Class Members;

      I.     An award of attorneys' fees and costs, as allowed by law;

      J.     An award of prejudgment and post judgment interest, as provided by law;

      K.     Leave to amend this Complaint to conform to the evidence produced at trial; and

      L.     Such other relief as may be appropriate under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

**DATED:** March 29, 2016

                                    */s/ Lauren E. Davis*          
                                      **Frith & Ellerman Law Firm, P.C.**
                                      Lauren E. Davis, Esquire (VSB # 74066)
                                      P.O. Box 8248
                                      Roanoke, VA 24014
                                      Telephone: 540/985-0098
                                      Facsimile:  540/985-9198
                                      ldavis@frithlawfirm.com

                                      **MCCULLEY MCCLUER PLLC**
                                      R. Bryant McCulley
                                      Stuart H. McCluer
                                      Frank B. Ulmer
                                      12022 Carolina Boulevard, Suite 300
                                      P.O. Box 505
                                      Charleston, SC 29451
                                      Phone: (205) 238-6757
                                      Fax: (904) 239-5388
                                      bmcculley@mcculleymccluer.com
                                      smccluer@mcculleymccluer.com
                                      fulmer@mcculleymccluer.com

- 104 -

**STUCKY & FIELDS LLC**
Christopher J. Stucky
Benjamin C. Fields
214 W. 18th St., Suite 200
Kansas City, MO 64108
Telephone: (816) 659-9970
Facsimile: (816) 659-9969
chris@stuckyfields.com
ben@stuckyfields.com

*Counsel for Plaintiff and the Proposed Class*